NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DAIMLERCHRYSLER FINANCIAL SERVICES AMERICAS, LLC, | Civil Action No. 06-5225 (SRC) |
| Plaintiff, | OPINION |
| v. | |
| WOODBRIDGE DODGE, INC., WOODBRIDGE LINCOLN MERCURY, INC., DENNIS F. ADAMS, JR. and MARYELLEN ADAMS, | |
| Defendants. | |

**CHESLER**, District Judge

This matter comes before the Court upon cross-motions for partial summary judgment [docket entries 87 and 88]. The motion for partial summary judgment filed by Defendants Woodbridge Dodge, Inc. ("WDI"), Woodbridge Lincoln Mercury, Inc. ("WLMI"), Dennis F. Adams, Jr. ("Mr. Adams") and his wife Maryellen Adams ("Mrs. Adams") (collectively, "Defendants") does not seek complete disposition of any claim but rather requests a ruling from the Court that the New Jersey Franchise Practices Act applies to this action. Plaintiff DaimlerChrysler Financial Services Americas, LLC ("Plaintiff" or "DaimlerChrysler Financial") moves for partial summary judgment as to Defendants' counterclaims and for an order striking their jury demand. This Court has considered the submissions by the parties in connection with these motions and has opted to rule without oral argument, pursuant to Federal Rule of Civil Procedure 78. For the reasons discussed below, this Court denies Defendants' motion and grants Plaintiff's motion.

I.   BACKGROUND

This is a breach of contract action arising out of various agreements pursuant to which DaimlerChrysler Financial provided secured wholesale inventory floor plan financing to WDI and WLMI, two motor vehicle dealerships owned by Mr. Adams. Because the dispute at bar centers on those agreements, the Court will outline them in this section of the opinion.

According to Defendants, the entry into various agreements at issue was set in motion by an assessment of WDI's financial condition performed by DaimlerChrysler Financial in March 2003. Based on the assessment, DaimlerChrysler Financial determined that the dealership was undercapitalized and needed more working capital. DaimlerChrysler Financial proposed making a capital loan to WDI and to the Adams' other car dealership, WLMI, in the total amount of $1.1 million. It also informed Mr. Adams that it wanted him to transfer WLMI's wholesale vehicle financing to DaimlerChrysler Financial. Mr. Adams agreed.

On August 11, 2003, WDI and WLMI entered into a Master Loan Security Agreement ("MLSA") with DaimlerChrysler Financial. Under the MLSA, DaimlerChrysler Financial agreed to provide secured wholesale inventory floor plan financing to WDI and WLMI. As a condition of this extension of credit, DaimlerChrysler Financial required Mr. and Mrs. Adams to execute Continuing Guaranties, which guaranteed the obligations of WDI and WLMI under the MLSA and its supplements and amendments.

According to DaimlerChrysler Financial, WDI and WLMI defaulted on the MLSA in several material respects, including failure to pay amounts due and owing under the loan documents, failure to remit proceeds of vehicle sales to DaimlerChrysler Financial (known as

"sales out of trust" in the automotive industry), failure to meet DaimlerChrysler Financial's tangible net worth requirements, failure to meet working capital requirements and failure to replace operational losses.  After negotiations between DaimlerChrysler Financial and the motor vehicle dealerships, in which all parties were represented by legal counsel, DaimlerChrysler Financial agreed to forbear on its rights under the MLSA in exchange for promises by WDI and WLMI to recapitalize the dealerships, among other commitments.  Thus, on September 30, 2003, the parties, including the Adams, entered into a Recapitalization and Loss Replacement Agreement ("Recapitalization Agreement").  In consideration of DaimlerChrysler Financial's forbearance and also in consideration of its continuing to make loans and extend credit to the dealerships, Defendants entered into a General Release on September 30, 2003.

On that same date, DaimlerChrysler Financial made two capital loans to the dealerships pursuant to the MLSA, a $500,000 loan to WDI and a $600,000 loan to WLMI.  Defendants contend that although the parties agreed in principle to the capital loans months earlier, by the time the loan documents were presented to Mr. Adams for his signature, terms had changed materially, to Defendants' detriment.  Though he protested to Edward Brewer, the credit manager at DaimlerChrysler Financial who had been involved in the capital loan negotiations, Mr. Adams asserts he was told to "sign the documents as is or there will be no deal."  (Dennis Adams Aff. ¶ 8.)

Defendants defaulted on their obligations under the Recapitalization Agreement.  The parties once again conducted negotiations, among themselves and through counsel, to modify and extend the contractual obligations they undertook.  On November 18, 2004, they entered into a Modification and Extension of Recapitalization and Loss Replacement Agreement

3

("Modification"), and on that same date, Defendants executed General Releases in favor of DaimlerChrysler Financial.

Subsequent defaults by Defendants under the MLSA and the Recapitalization Agreement could not be resolved by the parties. According to DaimlerChrysler Financial, Defendants refused to sign a second modified Recapitalization Agreement, which would have provided them a further opportunity to cure defaults. Due to the defaults and what DaimlerChrysler Financial viewed as the "seriously undercapitalized" state of the dealerships, DaimlerChrysler Financial served Defendants with a Notice of Termination on September 20, 2006. It advised that the credit facilities extended under the MLSA were terminated as of November 20, 2006 and that the loan obligations of WDI and WLMI were accelerated and due and owing on November 20, 2006. It further demanded that, in the event Defendants failed to pay the loan balances due, the dealerships surrender all collateral to DaimlerChrysler Financial, as the term "collateral" is defined in the MLSA. An amended Notice of Termination, served on September 27, 2006, detailed a further default on the August 2006 payment on the capital loan and demanded payment on the balance of the capital loan by October 2, 2006. It further advised that should Defendants fail to make this payment, the deadline for payment of all WDI and WLMI debt and credit facilities termination date would be moved up to October 2, 2006.

Defendants failed to pay the capital loan balance by October 2, 2006, and as a consequence, DaimlerChrysler Financial terminated their credit on October 19, 2006. DaimlerChrysler Financial filed this lawsuit in federal court on October 31, 2006, asserting

various claims for breach of contract and for replevin of the collateral securing WDI's and WLMI's obligations under the MLSA. Subject matter jurisdiction is based on diversity, pursuant to 28 U.S.C. § 1332.

Defendants do not dispute entering into the contracts. They contend, however, that the actions of DaimlerChrysler Financial rendered the dealerships' compliance with the terms of the MLSA and Recapitalization Agreements impossible. According to Defendants' version of the facts, they were induced to take the capital loans, execute personal guaranties, sign general releases and enter into the Recapitalization Agreement and its Modification by DaimlerChrysler Financial's promises to provide WDI new car inventory and a revolving used car line, the sales of which would allow WDI to raise cash and working capital and thereby enable Defendants to meet their financial obligations.[1] However, Defendants maintain, DaimlerChrysler Financial reneged on these promises despite knowing that the inventory was crucial to Defendants' profitability and business operations, on which their ability to perform under the contracts hinged. They also argue that the conditions placed by DaimlerChrysler Financial on the financing and its generally unfair dealing with Defendants caused the dealerships' operational losses and undercapitalization, precipitating default under the agreements and ultimately, following termination of the credit facilities, driving the dealerships out of business.

Defendants challenge the validity of the contracts and have counterclaimed for relief under various state law theories: the New Jersey Consumer Fraud Act ("CFA"), N.J.S.A. 56:8-1,

---

[1] The Court notes that it is summarizing Defendants' version of the facts. As the Court's later discussion will address, there is no evidence that DaimlerChrysler Financial, which is in the business of vehicle inventory financing, had any control over supplying product to the dealerships.

et seq. (Count I); unlawful interference with prospective economic advantage (Count II); breach of implied covenant of good faith and fair dealing (Count III); fraudulent misrepresentation (Count IV); and the New Jersey Franchise Practices Act ("FPA"), N.J.S.A. 56:10-1, et seq. (Count V).

The motions at bar mainly concern the viability of Defendants' counterclaims. Plaintiff seeks summary judgment on the FPA and CFA claims in whole and partial summary judgment on the common law counterclaims pled in Counts II, III and IV as barred in part by the General Releases. Plaintiff also seeks to strike Defendants' jury demand as waived by various contracts between the parties. Defendants concede that they may not obtain relief under the CFA, and the Court will accordingly grant Plaintiff summary judgment on that counterclaim.

## II.   DISCUSSION

### A.   Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Kreschollek v. S. Stevedoring Co., 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. See Boyle v. Allegheny Pennsylvania, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. See Celotex Corp. v. Catrett, 477

U.S. 317, 322-23 (1986).

Once the moving party has properly supported its showing of no triable issue of fact and of an entitlement to judgment as a matter of law, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also Anderson, 477 U.S. at 247-48.  The Supreme Court has held that and Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)); Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied, 507 U.S. 912 (1993) ("to raise a genuine issue of material fact . . . the [non-moving party] need not match, item for item, each piece of evidence proffered by the movant," but  "must exceed the 'mere scintilla' threshold").

    **B.**    **Analysis**

        1.    <u>New Jersey Franchise Practices Act</u>

The key issue presented to the Court in the motions at bar is whether the FPA applies. Clearly, it is the sole focus of Defendants' motion for partial summary judgment.  Moreover, as the discussion below will illustrate, Plaintiff assails Defendants' counterclaims and jury demand as untenable on the grounds that the FPA does not apply and therefore does not void the parties' contractual release and waivers.

The FPA governs the relationship between franchisor and franchisee, and of significance here, expressly creates a cause of action against the franchisor for violations of the act.  <u>N.J.S.A.</u>

56:10-10.  A "franchisor" within the meaning of the FPA is one who grants a franchise, defined as

> a written arrangement for a definite or indefinite period, in which a person grants to another person a license to use a trade name, trade mark, service mark, or related characteristics, and in which there is a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise.

N.J.S.A. 56:10-3.  It specifically defines a "motor vehicle franchisor" as

> a franchisor engaged in the business of manufacturing or assembling new motor vehicles, who will, under normal business conditions during the year, manufacture or assemble at least 10 new motor vehicles, and his motor vehicle distributors.

N.J.S.A. 56:10-13.

      DaimlerChrysler Financial argues that it is, beyond question, simply not a "franchisor" as defined by the Act, and therefore this action falls outside the statute's purview.  The evidence supports DaimlerChrysler Financial's position.  DaimlerChrysler Financial is a non-bank lending institution which provides wholesale floorplan and related financing to car dealerships.  Nowhere in the record is there any evidence that DaimlerChrysler Financial has a franchise agreement with either WDI or WLMI.  Indeed, there is no genuine dispute that DaimlerChrysler Financial did not grant a Dodge franchise to WDI or a Lincoln Mercury franchise to WLMI.  (On this point, DaimlerChrysler Financial highlights that Lincoln Mercury is a product of the Ford Motor Company, not Chrysler Motors.)   Nor is there any dispute that DaimlerChrysler Financial is not engaged in the manufacture or assembly of motor vehicles, as required to bring an entity within the FPA's definition of "motor vehicle franchisor."   DaimlerChrysler Financial underscores that despite the similarity of corporate names, Defendants' repeated reference to both lender and

8

franchisor as "DaimlerChrysler" and their treatment in moving papers as if both were a single entity, DaimlerChrysler Financial is a separate corporate entity from "Chrysler Motors, LLC" (formerly known as "DaimlerChrysler Motors Company, LLC") (hereinafter "Chrysler Motors"), the company which entered into a franchise agreement with WDI. Through affidavits and attached exhibits, Plaintiff demonstrates that DaimlerChrysler Financial is a limited liability company of the State of Michigan, whereas Chrysler Motors is a limited liability company of the State of Delaware.

Defendants counter that DaimlerChrysler Financial's conduct demonstrates that it was acting as the agent of Chrysler Motors in a calculated and concerted effort by lender and franchisor to drive the franchisee out of business so as to avoid the strict franchise termination requirements of the FPA. They argue that as an agent of the franchisor, DaimlerChrysler Financial comes within the ambit of the FPA, based on the statutory provision making it "a violation of this act for the franchisor, directly or indirectly, through any officer, agent, or employee to . . . provide any term or condition in any lease or other agreement ancillary or collateral to a franchise" that violates the FPA. N.J.S.A. 56:10-7.4.

Defendants' agency theory of liability against DaimlerChrysler Financial lacks legal support. Defendants cite to several cases from other jurisdictions finding that automobile credit companies were exposed to liability under the Automobile Dealers' Day in Court Act ("ADDCA"), 15 U.S.C. §§ 1221-1225, and the Illinois Motor Vehicle Franchise Act. Colonial Ford, Inc. v. Ford Motor Co., 592 F.2d 1126, 1128 (10th Cir. 1979); TLMS Motor Corp. v. Toyota Motor Dist., Inc., 912 F.Supp. 329, 332-33 (N.D. Ill. 1995); DeValk v. Ford Motor Co., 550 F.Supp. 1199, 1201-02 (N.D. Ill. 1982). This authority is unavailing to Defendants'

9

position, however, because the ADDCA and the Illinois statute define their target of liability in a materially different manner than the FPA.

For example, in one of the cases dealing with the ADDCA, Colonial Ford, the Tenth Circuit began its analysis with the language of the ADDCA itself. Colonial Ford, Inc., 592 F.2d at 1128. It noted that the ADDCA authorizes actions by dealers against "automobile manufacturers" for their bad faith acts and that the statute defines "automobile manufacturer" to include "any person, partnership, or corporation which acts for and is under the control of such manufacturer . . . in connection with the distribution of . . . automotive vehicles." Id. (quoting 15 U.S.C. § 1221(a)). The Colonial Ford court found that a financing company which was a wholly-owned subsidiary of the manufacturer involved with the dealer for the purpose of financing purchases of the manufacturer's inventory was under the manufacturer's control in connection with the distribution of vehicles and therefore subject to the ADDCA as a matter of law. Id. at 1129-30. Similarly, various provisions of the Illinois statute are not limited to automobile manufacturers and distributors but apply more broadly to include agents and others "who directly or indirectly impose unreasonable restrictions on the motor vehicle dealer or franchisee." TLMS Motor Corp., 912 F.Supp. at 332-33.

In contrast, the civil remedy created by the FPA lies against the *franchisor*: "Any franchisee may bring an action against its franchisor for violation of this act . . ." N.J.S.A. 56:10-10. "Franchisor" and the more specifically defined "motor vehicle franchisor" are terms of art, and their express statutory definitions govern here. Defendants reason that because what they described as a "captive financing company" can be held responsible under other statutes, which in Defendants' view define the entities subject to liability thereunder more narrowly than the

10

FPA, it also must be subject to liability under the FPA.  This reasoning is flawed and unpersuasive.  Their analysis does not engage the FPA's definition of franchisor or motor vehicle franchisor at all, which does not include agents of the franchisor, or to borrow the wording of the ADDCA, does not include those who are "under the control of" the franchisor.  Moreover, Defendants' reliance on N.J.S.A. 56:10-7.4, dealing with the franchisor's vicarious liability, is misplaced.  That the franchisor may be liable for violations committed through an agent, as provided by N.J.S.A. 56:10-7.4, does not imply that the agent may be liable under the FPA for its own acts constituting statutory violations.  In sum, the statutory constructions urged by Defendants in support of their position that DaimlerChrysler Financial may be subject to an FPA claim lack foundation, either in the statutory language itself or in any caselaw presented to the Court.

Thus, for the foregoing reasons, the Court holds that Defendants may not prevail as a matter of law on their FPA counterclaim against DaimlerChrysler Financial.  The Court will grant Plaintiff's motion for summary judgment as to that claim, and deny Defendants' motion for partial summary judgment seeking a ruling that the FPA applies to this action.

        2.        Partial Summary Judgment on Common-law Counterclaims

The remainder of Plaintiff's motion for summary judgment deals with the preclusion of the common-law claims pled in Counts II - IV of Defendants' counterclaim by operation of the General Releases of September 30, 2003 and November 18, 2004.  The Court finds that Plaintiff is entitled to partial summary judgment on these claims, to the extent they are based on acts, facts or events occurring on or prior to November 18, 2004.

The General Releases were executed by Mr. Adams, on behalf of WDI and WLMI, and

11

by Mr. and Mrs. Adams, each on their personal behalf.  By the express language included in all General Releases, including the two entered into on November 18, 2004, all Defendants named in this suit expressly released all "known and unknown" claims against DaimlerChrysler Financial which the "ever had, now have or hereafter can, shall or may have, for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the date of the date of this Release."  (Sartori Aff., Ex. H, J.)

It is well-established that a release is a contract and thus subject to enforcement under the usual principles of contractual interpretation.  Cooper v. Borough of Wenonah, 977 F.Supp. 305, 311 (D.N.J. 1997) (citing Restatement (Second) of Contracts § 284).  It is also well-established under New Jersey law that a signed release is presumptively valid and enforceable.  Id. at 311-12.  Defendants' effort to rebut that presumption on the grounds that the General Releases are void under the FPA is clearly futile, as the statute does not apply to their dispute with DaimlerChrysler Financial.  Moreover, to the extent Defendants may be understood to argue that the General Releases are void *ab initio* or voidable due to some material misrepresentation made by Plaintiff, fraud, duress or lack of consideration, Defendants have presented the Court with no evidence that would support vitiating the General Releases on those grounds.  The evidence, indeed, belies these assertions.  Defendants were represented by counsel in the negotiations culminating in the execution of the General Releases.  They entered into these contracts in consideration of DaimlerChrysler Financial's agreement to forbear on its rights under the MLSA triggered by Defendants' default thereunder and to continue to provide credit to WDI and WLMI, agreements which are memorialized in Section 1 of the Recapitalization Agreement and paragraph 13 of its November 18, 2004 Modification.  (Sartori Aff., Ex. G, I.)  Though Defendants' papers and Mr.

12

Adams's affidavit describe that he felt pressure to enter into the various agreements at issue in the lawsuit, including the General Releases, in order to save his businesses, "economic pressure alone is not enough to constitute duress rendering an otherwise valid release void." Keelan v. Bell Commc'ns Research, 289 N.J. Super. 531, 548 (App. Div. 1996).

### 3. Jury Waiver

Finally, the motion submitted to the Court by Plaintiff also seeks a ruling striking Defendants' jury demand based on the contractual jury waivers binding on all Defendants. The MLSA, executed by WDI and WLMI, the Continuing Guaranties, signed by Mr. and Mrs. Adams, and the Recapitalization Agreement, entered into by all Defendants, each contain a jury waiver provision. The question, then, is whether the jury waiver provisions, apart from the contracts as a whole, are valid.

In federal actions based on diversity jurisdiction, the right to a jury trial and, relatedly, the validity of a contractual jury waiver provision, must be determined as matter of federal law. Simler v. Connor, 372 U.S. 221, 222 (1963); In re City of Phila. Litig., 158 F.3d 723, 726 (3d Cir. 1998). The right, though guaranteed by the Seventh Amendment, may be waived. In re City of Phila. Litig., 158 F.3d at 726. Waiver of a jury trial must be made voluntarily and knowingly, and the burden of proving that this standard has been met falls on the party seeking enforcement of the waiver provision. First Union Nat. Bank v. United States, 164 F.Supp.2d 660, 663 (E.D. Pa. 2001). A waiver meets the voluntary and knowing standard when: "(1) there was no gross disparity in bargaining power between the parties, (2) the parties are sophisticated business entities, (3) the parties had an opportunity to negotiate the contract terms, and (4) the waiver provision was conspicuous." Id.

13

The Court finds the standard has been met. Plaintiff has shown that Defendants were represented by counsel at all relevant times, including in connection with their entry into the contracts containing the waiver provisions. Thus, there was no gross disparity in bargaining power. The record also reflects that the parties were sophisticated business entities. Mr. Adams's affidavit details that the Adams had been in the car dealership business for years, with WDI in business since 1969, and that they were consistently rewarded for the outstanding performance of WDI. The contracts at issue were negotiated by the parties through counsel. Finally, the waiver provision in the MLSA and the Continuing Guaranties are conspicuous. The provision in each of those documents is in bold print, with the provision title of "Jury Waiver" appearing in all caps in a font larger than the surrounding text.

The only basis Defendants offer for not enforcing the waiver is the FPA provision which prohibits a motor vehicle franchisor from requiring the franchisee "to waive trial by jury in actions involving the motor vehicle franchisor." N.J.S.A. 56:10-7.3. The motor vehicle franchisor is neither a party to the contracts at issue nor to this action, and this provision is therefore inapposite.

For these reasons, the Court finds that an order striking Defendants' jury demand is warranted.

**III.** **CONCLUSION**

For the foregoing reasons, the Court grants Plaintiff's motion for partial summary judgment and their request to strike the jury demand and denies Defendants' motion for partial summary judgment. An appropriate form of order will be filed together with this Opinion.

                                                   s/Stanley R. Chesler
                                                   STANLEY R. CHESLER
                                                   United States District Judge

DATED: July 14, 2009